IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

DARRIN GRUENBERG,

                      Plaintiff,                    OPINION & ORDER

  v.

                                                                     13-cv-095-wmc

EDWIN TETZLAFF,

                      Defendant.
_____

      In this prisoner litigation, plaintiff Darrin Gruenberg was granted leave to proceed on claims that his Eighth Amendment rights were violated when he was strip searched and placed into controlled segregation for several hours without a mat or clothing. (Apr. 7, 2014 Opinion & Order (dkt. #8).) Subsequently, the court denied defendant Edwin Tetzlaff's motion for summary judgment for failure to exhaust administrative remedies. (Nov. 14, 2014 Opinion & Order (dkt. #40).) Before the court now is Tetzlaff's renewed motion for summary judgment on the merits of Gruenberg's claims. (Dkt. #44.) In response to this motion, Gruenberg withdrew his strip search claim. With regard to Gruenberg's remaining conditions of confinement claim, Gruenberg has not submitted evidence from which a reasonable jury could find that his cell conditions were objectively serious enough to deprive him of the "minimal civilized measure of life's necessities." Even if Gruenberg *had* made that showing, Gruenberg has also submitted no admissible evidence showing that Tetzlaff was deliberately indifferent to those conditions. Accordingly, Tetzlaff's motion for summary judgment will be granted in full.

UNDISPUTED FACTS[1]

**I. The Parties**

At all times relevant to this complaint, Darrin Gruenberg was an inmate housed at Columbia Correctional Institution ("CCI"), a maximum-security institution located in Portage, Wisconsin. Gruenberg was subsequently housed at Wisconsin Secure Program Facility ("WSPF") until his release on February 10, 2015.

From August 2010 until August 2011, Edwin Tetzlaff was employed by the Wisconsin Department of Corrections ("DOC") as a Supervising Officer 1 (Lieutenant) at CCI.

**II. Controlled Segregation**

Under Wisconsin's Administrative Code, a security supervisor may place an inmate into controlled segregation when that inmate exhibits disruptive or destructive behavior. Wis. Admin. Code § DOC 303.74(1).[2] In controlled segregation, the Code generally requires that inmates still be provided with adequate clothing, essential hygiene supplies and nutritionally adequate meals. § DOC 303.74(2)(a). However, while an inmate is acting in a disruptive manner, the institution may restrict access to (or as DOC euphemistically refers to it, "maintain close control" of) most property, including clothing. § DOC 303.74(2)(b).

---

[1] Unless otherwise noted, the court finds the following facts to be material and undisputed for purposes of summary judgment.
[2] This section was previously numbered Wis. Admin. Code § DOC 303.71(1). While Gruenberg purports to dispute this statement of current law in his response to defendant's Proposed Finding of Fact, he does not appear to dispute a security supervisor's legal discretion to act in this way under the Administrative Code. Rather, Gruenberg appears to dispute whether *he in fact* engaged in disruptive or destructive behavior during the incident that prompted his transfer to controlled segregation. Regardless, the general provisions of the Administrative Code remain undisputed.

Based on his experience as a DOC employee, Tetzlaff avers that close control of property is necessary when an inmate is acting disruptively, because property has a high potential to promote further disruptive behavior and the destruction of property. Property can also be used by disruptive inmates to harm themselves or staff. According to Tetzlaff, therefore, it is important for the inmate's safety and the safety of staff alike that an inmate not be agitated when given access to property in controlled segregation.

**III. Gruenberg's February 24 Protest**

On February 24, 2011, at about 5:35 p.m., Tetzlaff was called to the DS-1 housing unit, where he was notified that eight inmates, including Gruenberg, were refusing to return their meal trays through the door slot in their cells as a means of protest against the size of food portions. When Tetzlaff arrived, three inmates apparently returned their trays without further protest.

Tetzlaff then spoke to Gruenberg. While they were talking, Gruenberg scratched up a plastic covering over his cell-door window until there was almost zero visibility. (*See* Pl.'s Resp. DPFOF (dkt. #54) ¶ 16; Darrin A. Gruenberg Decl. (dkt. #55) ¶ 2.) In response, Tetzlaff made the decision as the supervising officer to place Gruenberg in controlled segregation for disruptive behavior and destruction of property.[3] Because of Gruenberg's refusal to comply with orders, Tetzlaff also ordered the assembly of a pad-subduing team, notified the shift commander and the Administrative Duty Officer ("ADO") of the situation, and gained authorization for the planned use of force from ADO Captain Morgan. While the team assembled for this purpose, all of the other remaining protesting inmates returned their trays.

---

[3] As a result of this incident, Gruenberg also received conduct report #2210851.

According to defendant, Gruenberg also placed his tray at the cell door lower trap as if to return it, but then kicked it toward Correctional Officer Cichanowicz, sending food onto his leg and breaking the meal tray. Gruenberg denies kicking his meal tray, maintaining that he "merely declined to return it." He also denies having damaged the meal tray in any way. The parties agree, however, that Gruenberg refused to hand out his utensils.

At about 5:55 p.m., Tetzlaff made an on-camera introduction with his team; he appears on video as the individual wearing a white shirt. (*See* Isaac Hart Decl. Ex. 1004 (dkt. #47) (video recording).) He explained that Gruenberg had decided to keep his meal tray; had incited others to engage in the same behavior; had caused damage to the cell; and remained in possession of his utensils, which he refused to hand out. Tetzlaff also noted that Gruenberg had a history of group resistance and threats to staff, although Gruenberg disputes this as well. (Darrin A. Gruenberg Decl. (dkt. #55) ¶ 7.) On the video camera, Tetzlaff also identified Correctional Officer Benjamin Neumaier as the person holding the camera.

When they arrived at Gruenberg's cell, Tetzlaff and the team immediately gained voluntary compliance from Gruenberg. Staff applied handcuffs and leg restraints to Gruenberg, and he was escorted from his cell to the observation area shower.

**IV. The Strip Search**

When Gruenberg arrived at the observation area shower, staff conducted a strip search per Wis. Admin. Code § DOC 306.17. As the video shows, Gruenberg was placed in the strip cell and asked to remove his own clothes. Gruenberg complied, handing his

clothes to staff through the door trap while they visually inspected Gruenberg through the strip search cell door.

Gruenberg was in the strip search cell for one minute, twenty-one seconds. Only the four team members could see Gruenberg during the search, and Gruenberg was covered with a towel as soon as he exited the cell and restraints were applied. Without further incident, the team then escorted Gruenberg to controlled segregation. He made no complaints regarding the search itself.

**V. Placement in Controlled Segregation**

Defendant contends that Gruenberg's placement in controlled segregation was due to his "disruptive and destructive behavior." According to defendant, Gruenberg damaged his food tray, his cell door window and his cell walls, causing more than $100 in damage. (*See* Isaac Hart Decl. Ex. 1007 (dkt. #47-5) (photographs of damage to cell).) Gruenberg denies this, asserting that he caused no *damage* to his food tray or cell door window. Instead, he acknowledges "scratch[ing] a plastic covering that covered the cell-door window and merely remov[ing] a few chunks of caulking from the DS-I cell #04 door frame inside the cell." (Darrin A. Gruenberg Decl. (dkt. #55) ¶ 2.)

In response, defendant notes that the Disciplinary Hearing Committee ultimately found it more likely than not that Gruenberg damaged his tray and cell. (Ellen K. Ray Decl. Ex. 1009 (dkt. #48-1) 4.) As a result, the Committee ordered him to pay $143.53 in restitution. (*Id.*) Apparently, Gruenberg admitted in his written statement to the Committee that he violated Wis. Admin. Code § 303.35, which at the time referred to "Damage or Alteration of Property." (*Id.* at 2, 8.)

5

Upon Gruenberg's placement in controlled segregation, Tetzlaff also decided that Gruenberg should not receive a smock or mattress upon entry into controlled segregation. Tetzlaff based that decision on Gruenberg's behavior, as well as his "agitated state," which Tetzlaff believed put Gruenberg at risk for damaging more property, hurting himself or staff and causing further disruption. Unsurprisingly, Gruenberg disputes this characterization as well, averring that he was at no time in an agitated state, but rather was calm, quiet, cooperative and compliant with staff demands.

When an inmate is placed in controlled segregation, he is observed by staff every thirty minutes. That observation involves an officer looking into the cell to see what the inmate is doing and to ensure the inmate is okay. Each observation is logged on a DOC-112 Observation of Offender log.

At 6:06 p.m., Tetzlaff noted Gruenberg's placement due to: "disruptive behavior; no smock, no mat." More specifically, Tetzlaff noted that the reason for placement was "group resistance, damage to tray and cell, kicking tray at staff." Tetzlaff also noted making the first observation of Gruenberg at 6:06 p.m., at which time Gruenberg was standing at the door "talking to staff." According to Tetzlaff, during their conversation, he told Gruenberg he would come back and give him a smock, while Gruenberg contends that he never received any information from Tetzlaff regarding a mat or smock. The parties agree that during this time (a) Gruenberg continued to protest meal portions received; (b) Tetzlaff stated he would include Gruenberg's protest in his report; and (c) Tetzlaff told Gruenberg he would return on third shift to review his placement.

6

**VI. Conditions in Controlled Segregation**

When Gruenberg first entered controlled segregation, he reports asking to be seen by HSU for aches and pains stemming from his earlier placement in a restraint chair during first shift (6:00 a.m. to 2:00 p.m.), but he was not permitted to see the nurse. While Tetzlaff reports being unaware of the details surrounding Gruenberg's placement in the restraint chair, he represents that it is not customary to offer medical attention following placement in a restraint chair, unless force was used. Gruenberg disputes Tetzlaff's account, stating that in his experience, including five separate restraint chair immobilizations at Waupun Correctional Institution between April 19 and April 24, 2006, HSU nurses immediately conduct vitals checks after an inmate's immobilization, as well as offer stock medication for aches and pains immediately after placement.

Gruenberg also complains about the temperature within his controlled segregation cell. According to the Excel Building Supervisor Historical Trend Event Log (Isaac Hart Decl. Ex. 1006 (dkt. #47-4)), however, the temperature in "analog 1," which covers cell 44 on DS-1 where Gruenberg was housed, was consistently 76 degrees Fahrenheit from 6:00 p.m. on February 24, 2011, until 1:15 a.m. on February 25. At the same time, "Analog 5," which reflects the outdoor temperature, recorded a temperature that ranged between 34 and 40 degrees Fahrenheit.

While Gruenberg does not dispute the recorded temperature readings in analog 1 during that time period, he claims that the lower air vent in his cell was "clogged with debris," reducing the cell temperature to no more than 60 degrees Fahrenheit (a number he calculated based on his "life experience" and the "feelings in his skin/body"). (Darrin A. Gruenberg Decl. (dkt. #55) ¶ 15.) Gruenberg also observed snow on the ground outside his

cell's rear window and felt frigid air seeping in through the crack of the window frame. (*Id.*) According to Gruenberg, he raised all these problems with Line Officer Pence, who told him that Tetzlaff knew of these problems and would e-mail maintenance. (Pl.'s Resp. DPFOF (dkt. #54) ¶ 49.)

Gruenberg admits that he did not complain directly to Tetzlaff that his cell was cold, nor did he tell Tetzlaff that he suffered any pain or injuries due to his placement in controlled segregation. There was in fact no interaction between Gruenberg and Tetzlaff until 1:15 a.m., when Tetzlaff returned and gave Gruenberg a segregation blanket and mat. After that, Gruenberg was observed every half-hour until 3:00 p.m. on February 25, 2011, when he was released from controlled segregation.

Following Gruenberg's placement in controlled segregation, there is no record that he was seen by HSU staff with complaints of pain, injury, soreness, trauma, humiliation, foot pain or buttock pain. While Gruenberg contends that he *did* submit a Health Services Request form for aspirin or Tylenol to relieve soreness stemming from his placement in controlled segregation, there is also no record of this or any other request for health care, nor is there any record that Gruenberg complained that his cell was cold or that he was in pain during his placement.

OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.

8

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Factual disputes preclude summary judgment only if the "facts might affect the outcome of the suit under the governing law." *Id.* at 248.

The party moving for summary judgment bears the initial burden of showing there is no genuine issue of material fact and that it is entitled to relief. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once this initial burden is met on an issue for which a nonmoving party will bear the burden of proof at trial, that party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. The nonmoving party may not "simply show some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If he fails to do so, "[t]he moving party is 'entitled to a judgment as a matter of law.'" *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)). Here, Gruenberg has offered insufficient proof to meet this threshold.

**I. Strip Search Claim**

Originally, Gruenberg asserted an Eighth Amendment claim for an improper strip search, alleging that Tetzlaff forced him to spread his buttocks for an unreasonably long time and did so for no other purpose than to humiliate him. While the court granted Gruenberg leave to proceed on that claim (Apr. 7, 2014 Opinion & Order (dkt. #8) 6), after defendant produced a video recording of the strip search on summary judgment,

Gruenberg withdrew his strip search claim. (*See* Pl.'s Resp. DPFOF (dkt. #54) ¶¶ 8-13. Accordingly, that claim will be dismissed with prejudice.

**II. Conditions of Confinement Claim**

Gruenberg was also granted leave to proceed on his Eighth Amendment claim that he was confined in a freezing cold cell without a mat or security smock. Prisoners have an Eighth Amendment right to "humane conditions of confinement," *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), including adequate shelter and "protection from extreme cold." *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997).

Successful proof of any Eighth Amendment claim requires a two-part showing. The first prong requires proof that the alleged deprivation was "sufficiently serious" on an objective basis such that an official's act or omission results in the "denial of the minimal civilized measure of life's necessities." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (*citing Farmer*, 511 U.S. at 834). For claims based on low cell temperature for example, several, objective factors may be relevant, including: "the severity of the cold; its duration; whether the prisoner has alternative means to protect himself from the cold; the adequacy of such alternatives; as well as whether he must endure other uncomfortable conditions as well as cold." *Dixon*, 114 F.3d at 644. The second prong requires proof that the prison official acted with a subjectively culpable state of mind, known as "deliberate indifference" -- that is, the official knew about the risk of harm, had the ability to prevent the harm, and failed to do so. *Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009).

A. **Objective Prong**

In opposing summary judgment, Gruenberg has failed to produce evidence to show on an objective basis that his cell conditions were "sufficiently serious." As a preliminary matter, there is no objective, verifiable evidence in the record demonstrating the degree of cold in Gruenberg's cell during the relevant time period. The only concrete evidence available comes from prison building records, which documents the temperature within the "analog 1" area in which Gruenberg was confined at a consistent 76 degrees. In contrast, Gruenberg avers that *his* cell "felt" closer to 60 degrees, due to (1) a buildup of debris in the cell's air vent; and (2) frigid air seeping in through cracks in the frame of the cell's window.

Whether a jury could credit Gruenberg's testimony that the temperature in his cell was closer to 60 degrees is questionable, given that he appears to have no particular expertise that would enable him to determine the temperature in his cell. Nor does he submit any evidence providing objective markers, such as freezing water, that might assist a determination of the temperature.

Even so, a jury *could* believe Gruenberg's testimony that his cell felt cold and uncomfortable because of a clogged air vent, a leaky window frame, and low outside temperatures. A jury also could believe Gruenberg's testimony that he was particularly uncomfortable without clothing, blankets or a mat, especially because he was in pain from his earlier confinement in restraints. Finally, a jury *could* believe that Gruenberg's pain was sufficiently severe, such that it prompted him to submit a written HSU request for Tylenol, even if there is no longer any evidence of such a request.

Even if all of the record evidence is viewed in Gruenberg's favor, however, a reasonable jury could conclude at most that the temporary conditions in his cell were

11

uncomfortable, even extremely so, but *not* "sufficiently serious" to amount to an objective deprivation "of the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. Standing and sitting in a 60-degree cell without clothing or a blanket for seven hours must have seemed harsh, particularly without knowing how much longer this deprivation would last, but "[p]rison conditions may be harsh and uncomfortable without violating the Eighth Amendment's prohibition against cruel and unusual punishment." *Dixon*, 114 F.3d at 642.

*First*, Gruenberg offers no evidence that exposure to 60 degrees air temperature amounts to "extreme cold." *Id.* (prisoners have a right to protection from "extreme cold"). Moreover, even under Gruenberg's version of events, he went without clothing and a mat for roughly seven hours (from approximately 6:00 p.m. to 1:00 a.m.). More significantly, Gruenberg neither claims to have suffered, nor submitted any evidence that he actually suffered any serious ill effects from his exposure to cold temperatures during this seven-hour period, other than general discomfort and achiness.

*Second*, this record simply does not compare to cases in which the Seventh Circuit has found possible, unconstitutional conditions of confinement warranting a trial. *See, e.g., Dixon*, 114 F.3d at 642 (temperatures in cell averaging 40 degrees and regularly falling below freezing for four consecutive winters); *Gillis v. Litscher*, 468 F.3d 488, 490 (7th Cir. 2006) (inmate spent five days naked in a cell with only a bare concrete slab to sleep on, and cell was so cold that inmate had to walk 14 hours a day to stay warm); *Del Raine v. Williford*, 32 F.3d 1024, 1031 (7th Cir. 1994) (inmate was repeatedly placed naked in cell with an open window and an outdoor wind chill of 40 to 50 degrees below zero); *Murphy v. Walker*, 51 F.3d 714, 720-21 & n.15 (7th Cir. 1995) (unheated cell without bed, mattress, pillows, blankets or clothing for a week and a half); *Henderson v. DeRobertis*, 940 F.2d 1055, 1057-58

12

(7th Cir. 1991) (four days of sub-zero temperatures, broken heat system and windows, coupled with refusal to provide extra blankets or winter clothing).

*Third*, Gruenberg's allegations are much closer to the conditions considered by the Seventh Circuit in *Mays*, 575 F.3d at 648–49.  In that case, the plaintiff was denied certain winter clothing and, as a result, suffered from "hurt ears and numb hands, felt frostbite, and caught colds."  *Id.*  The court nevertheless rejected plaintiff's claim because the prisoner had not shown that he was "forced to be in the cold for long periods of time or that he suffered anything more than the usual discomforts of winter."  *Id.*  Like the plaintiff in *May*, Gruenberg's discomfort was temporary and resulted in no serious ill effects.

The court in no way means to suggest that denying Gruenberg some minimal covering and a basic mat from 6 p.m. to 1 a.m. is an acceptable practice, at least absent some evidence of possible suicidal tendencies, evidence of regular monitoring or knowledge of actual conditions within the cell.  Rather, the court is holding that it does not amount to an Eighth Amendment violation on the sparse record offered by plaintiff on summary judgment.

Accordingly, Gruenberg has failed to submit sufficient evidence that the conditions in his cell were "sufficiently serious" so as to deprive him of "the minimal civilized measure of life's necessities."[4]

---

[4] Although Gruenberg had the burden to come forward with supporting, objective evidence, the court could find no evidence from a cursory review online that a seven hour exposure to 60 degree temperatures presented objectively serious harm or risk of harm.  Indeed, the only circumstances where a severe risk of harm exists would be if a person had been *immersed in water temperatures* of 60° to 70° between two to seven hours.  http://www.businessinsider.com/how-long-does-it-take-to-get-frostbite-or-hypothermia-2014-1.  However, "[w]ater conducts heat away from the body 25 times faster than air."  http://www.princeton.edu/~oa/safety/hypocold.shtml.  Crediting Gruenberg's subjective description during his seven hour ordeal, his symptoms suggest he may have been

B. **Subjective Prong**

Even if Gruenberg *had* established a genuine issue of fact as to whether his cell conditions were objectively unconstitutional, Gruenberg cannot satisfy the subjective, deliberate indifference prong of his claim. This prong requires Gruenberg to show that Tetzlaff knew Gruenberg faced a "substantial risk of serious harm" but disregarded that risk "by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Gruenberg has pointed to no admissible evidence to show that *Tetzlaff* knew of the uniquely harsh conditions alleged present in his segregation cell from 6 p.m. to 1 a.m.

To be fair, Tetzlaff's opening brief did not develop his argument regarding a lack of evidence of subjective intent as a basis for summary judgment. Only in Tetzlaff's reply brief did he specifically argue that Gruenberg presented no evidence with respect to the subjective prong of deliberate indifference. (Br. Reply (dkt. #57) 3.) However, Tetzlaff did refer to the law on deliberate indifference in his opening brief, (Def.'s Br. Support Summ. J. (dkt. #45) 8-10), and proposed several findings of fact relevant to the deliberate indifference inquiry. (DPFOF (dkt. #46) ¶¶ 44, 45, 48, 51, 52). Moreover, Gruenberg's responses to those specific, proposed findings confirm that he cannot satisfy the subjective prong of his claim.

In particular, Tetzlaff proposed as a finding of fact that Gruenberg never complained to him about his cell temperature, nor about pain or injury incurred while in controlled segregation. *Id.* In response to Tetzlaff's proposed findings, Gruenberg acknowledges never

---

approaching "mild hyperthermia," if that. *Id.*; http://www.mayoclinic.org/diseases-conditions/hypothermia/basics/symptoms/con-20020453. Regardless, it was Gruenberg's burden to present objective evidence of serious harm or risk of harm, something neither his subjective observations or symptoms, nor reasonable inferences, suffice to do.

14

complaining about his cell being too cold to Tetzlaff.  Instead, Gruenberg avers only that he repeatedly voiced his complaints of pain, soreness and cold to staff member Pence, who at some point told Gruenberg that "Tetzlaff is aware of your concerns."  (Pl.'s Resp. DPFOF (dkt. #54) ¶ 44.)  However, Pence's out-of-court statement is being offered in order to prove its truth -- that is, that Tetzlaff *was* in fact aware of Gruenberg's complaints.  This renders Pence's statement hearsay, *see* Fed. R. Evid. 801(c), 802, and "[a] party may not rely upon inadmissible hearsay to oppose a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).  Nor do any of the exceptions to the rule against hearsay appear to apply to render Pence's statement admissible for its truth.  *See* Fed. R. Evid. 803.

At most, Tetzlaff knew that Gruenberg had no smock or mat, having himself directed those deprivations.  But there is no evidence Tetzlaff knew that:  (1) Gruenberg was in physical pain as result of the cold cell; (2) the cell vent was clogged such that the temperature was 60 degrees, rather than 76; (3) the window frame was cracked, allowing frigid air to seep into the cell from the outside; or (4) Gruenberg had requested medical attention for soreness and pain.  Without some admissible evidence that *Tetzlaff* knew of these conditions, no reasonable jury could find that he knew Gruenberg "face[d] a substantial risk of serious harm," *Farmer*, 511 U.S. at 847, let alone that he failed to take reasonable measures to abate such a risk.[5]

---

[5] Gruenberg suggests in his briefing that the fact that line staff check inmates in controlled segregation every thirty minutes would permit a reasonable trier of fact to presume Tetzlaff's knowledge that those inmates are at substantial risk of serious harm.  (Pl.'s Br. Opp'n (dkt. #53) 4.)  On this fact alone, the opposite presumption would be more reasonable, since *every* inmate who is placed in controlled segregation would actually be subject to half hour checks for any risk of serious harm, as well as a regular opportunity to bring such a risk to an officer's knowledge.  Furthermore, a contrary inference would actually impose liability on prison officials for taking precautions, such as

Finally, even if there were admissible evidence that Pence told Tetzlaff about Gruenberg's complaints of being "cold" and achy, this would not be enough to satisfy the deliberate indifference standard, since this information would not put Tetzlaff on notice that Gruenberg's cell conditions were so bad that he was at substantial risk of serious harm. If anything, it would be reasonable to infer that since Tetzlaff knew Gruenberg was in a cell without any clothing or bedding, he likely inferred that Gruenberg was somewhat cold, but *not* that he was "extremely or severely cold," much less that he was suffering significant pain as a result of the temperatures in his cell. Indeed, a reasonable jury would have *no* basis on this record to find that Tetzlaff knew the conditions in Gruenberg's cell subjected him to substantial risk of health or safety, much less that Gruenberg was being deprived of the "minimal civilized measure of life's necessities." Accordingly, Gruenberg cannot satisfy the subjective prong of his Eighth Amendment claim either.

ORDER

IT IS ORDERED that defendant Lt. Tetzlaff's motion for summary judgment (dkt. #44) is GRANTED for all the reasons set forth above. The clerk of court is, therefore, directed to enter judgment for defendant and close this case.

Entered this 15th day of September, 2015.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge

---

checking on inmates more frequently, which is *inconsistent* with the Eighth Amendment's requirement that only officials who act with a "culpable state of mind" be held liable for deliberate indifference.